UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **MELISSA GOYENS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | CIVIL ACTION NO. 4:13-CV-00419 |
| **CAROLYN W. COLVIN,** | § | |
| **Acting Commissioner of Social** | § | |
| **Security Administration** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of denial of Social Security benefits, Plaintiff

Melissa Goyens ("Goyens") filed a Motion for Summary Judgment pursuant to 42 U.S.C.

§ 405(g).   Dkt. 7.   Defendant Carolyn W. Colvin ("Commissioner"), Acting

Commissioner of Social Security, filed her own Motion for Summary Judgment and Brief

in Support.   Dkt. 9.   The parties have consented to have this Court conduct all

proceedings, pursuant to 28 U.S.C. § 636(c).  Having considered the parties' briefing, the

applicable legal authorities, and all matters of record, the Court orders that Goyens'

motion be **DENIED** and summary judgment be **GRANTED** for the Commissioner.

## I.    BACKGROUND

Goyens is a 38-year-old woman with a high school education and two years of

college.  Tr. 73, 133, 794.  Goyens has worked in various jobs, including as a data entry

clerk, an administrative assistant, a customer service/sales representative, and as a cashier and stocker in a bookstore. Tr. 32, 67, 161.

## A.    Goyens' Medical Records

### 1.  Physical Complaints

Goyens' relevant medical records date back to December 14, 2005, when she complained of bilateral shoulder pain and anxiety. Tr. 310-314.  Shortly afterwards, on January 2, 2006, Goyens was hospitalized at San Jacinto Methodist Hospital for a suicide attempt in which she overdosed on medications. Tr. 239, 293, 460.  During 2006, Goyens saw several physicians, complaining of fatigue, insomnia, and chronic pain. Tr. 318-341.

In mid-June 2007, Goyens began visiting the Baytown Clinic of the Harris County Hospital District ("Baytown Clinic"). Tr. 298-307.  Goyens self-reported a number of ailments, including fibromyalgia and consistent pain. Tr. 300.  In August 2007, a physical examination was normal. Tr. 301-304.

Eight months later, in April 2008, Goyens again returned to Baytown Clinic, complaining of pain. Tr. 304.  Goyens reported that she had not taken her prescribed medications for several months because "she did not like the way they made her feel." Tr. 37-38, 304.  Goyens was referred to Dr. Johnathan S. Forester.  At her first visit with Dr. Forester, Goyens reported an insect bite in May 1995 and stated that she was being treated for fibromyalgia.  Tr. 481-483, 507-511, 784.  The laboratory tests showed Goyens was positive for Lyme IgG.  Tr. 495, 499-500, 505, 583.  Accordingly, Dr. Forester prescribed over ten medications for Goyens. Tr. 480, 484-488.

2

In 2009, Goyens continued her treatment with Dr. Forester, but stopped when his office no longer accepted her insurance. Tr. 39, 307-311. On March 30, 2009, Goyens saw another doctor for multiple complaints relating to her Lyme Disease. Tr. 39, 307-311. The laboratory tests from that day were normal. Tr. 39, 310. In July 2009, Goyens began seeing Dr. Patricia D. Salvato, complaining of pain, fatigue, cognitive difficulties, anxiety, bipolar disorder, and Lyme disease. Tr. 39, 560-562. In June 2010, Dr. Salvato ordered several tests that showed that Goyens was negative for Lyme disease but that she was allergic to several substances. Tr. 43.

After September 7, 2010, the record does not reflect any medical treatment for Goyens' physical complaints. Tr. 43, *see also* Transcript Index.

### 2. Mental Health

From March 2009 to April 2011, Goyens visited three mental health care doctors. Tr. 45, 467, 516, 619. Between March 2, 2009, and October 5, 2009, Dr. Rita Cowen treated Goyens for bipolar disorder. Tr. 45, 467-471. During that time, Goyens also saw Dr. Athi P. Vekatesh for mood swings. Tr. 45, 378, 619-789. From May 12, 2010 to April 27, 2011, Goyens sought treatment from Dr. Richard Noel. Tr. 516-529. Dr. Noel treated Goyens by adjusting her prescribed medications. Tr. 517-518.

### B.   Application for Benefits

On May 26, 2010, Goyens filed an application for Social Security disability benefits, alleging that she had become disabled as of December 31, 2007. Goyens listed several conditions, including Lyme Disease, arthritis, fibromyalgia, chronic fatigue,

irritable bowel syndrome, chronic pain, a thyroid disorder, anxiety, panic attacks, depression, and bipolar disorder. Tr. 20, 122-125, 146, 133.

Goyens was seen by Dr. Kathleen Senior for a consultative psychological examination on September 13, 2010. Tr. 813. Dr. Senior described Goyens' mental activity was "coherent," but "mildly slowed." Tr. 814. Dr. Senior also described Goyens as fully oriented, with intact remote memory and fair recent memory. Dr. Senior assessed Goyens' immediate memory as "Low Average" and stated that Goyens had intact concentration, fully present abstraction, and that her insight was "fair." She reported Goyens' activities of daily living as including a limited range of household chores, noting that she lives with her husband and children although Goyens had admitted that she was not "really together" with her husband, and she had only married him for health insurance. Tr. 813, 815. Dr. Senior assessed Goyens' Global Assessment of Functioning ("GAF") score at 55 and ranked her prognosis as "fair." Tr. 815.

On October 4, 2010, Dr. Veene Ghai reviewed Goyens' medical records and completed a Psychiatric Review Technique form. Tr. 816. Dr. Ghai determined that Goyens suffered from bipolar disorder, panic disorder, and polysubstance abuse. Tr. 819, 821, 824. Dr. Ghai also opined that Goyens' impairments caused moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. 826. Dr. Ghai concluded that Goyens' mental impairments were "more than non-severe but do not meet/equal listing." Tr. 828. Dr. Ghai also stated that

Goyens' allegations were "supported by [medical records] but limitations are not; clmt. is partially credible." *Id.*

Dr. Ghai also completed a Mental Residual Functional Capacity evaluation based on Goyens' medical records. Tr. 830. Dr. Ghai opined that Goyens was "markedly limited" in the ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. Tr. 830. Dr. Ghai concluded that Goyens was "moderately limited" in several areas, most notably in areas of sustained concentration and persistence and social interaction. Tr. 830, 831. Dr. Ghai also found Goyens was "moderately limited" in her ability to respond appropriately to changes in the work setting. Tr. 831. Dr. Ghai concluded that Goyens could "understand, remember and carry out only simple instructions, make simple decisions, attend and concentrate for adequate periods, interact adequately with co-workers and supervisors and respond appropriately to changes in routine work setting." Tr. 832.

On October 15, 2010, Dr. Kelvin Samaratunga completed a Physical Residual Functional Capacity Assessment form. Tr. 834-841. Dr. Samaratunga noted Goyens' primary diagnosis of Lyme disease, fatigue and fibromyalgia, but nonetheless opined that she could perform the full range of light work: *i.e.,* could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday. Tr. 835. He also rated her ability to push and/or pull as "unlimited." *Id.* Similarly, Dr. Samaratunga did not find that Goyens had any postural, manipulative, visual, communicative or environmental limitations. Tr. 836-838. He noted that his opinion took Goyens' alleged symptoms of pain and fatigue

into account, but he also noted that her most recent lab results were negative for Lyme disease and that Goyens was reporting less tenderness and pain. Tr. 841. He concluded that Goyens' allegations were "partially supported by [the evidence] in file; clmt. is partially credible." Tr. 841.

### 3. ALJ Hearing and Decision

On November 9, 2011, ALJ John Sullivan held a hearing at which Goyens appeared, represented by counsel. Tr. 20. Goyens testified at the hearing, as did an independent vocational expert ("VE"). Tr. 20.

Goyens testified that she became disabled in December 2007. At that time, she was working as a part-time cashier at a college bookstore but was fired because she missed approximately two days a week of work. Tr. 56. Goyens also testified that she could not stand for the long periods of time that the job required. Tr. 57.

Goyens described her diagnosis, symptoms, and treatment of Lyme Disease. Tr. 59. Goyens testified that she stopped taking her prescribed medication because, "I didn't like taking the pain medicine. They made me feel funny." Tr. 60. Goyens then described the home remedy treatments she used instead to ease her pain. Tr. 60. Goyens testifies that she does take four medications, prescribed by Dr. Noel, to treat her bipolar and depression. Tr. 63.

Goyens stated that she is only able to stand for about fives minutes, and that her husband does most of the household chores. Tr. 61-62. Goyens also stated her ability to lift and carry objects is very limited and that her "hands start hurting if [she] tr[ies] to put makeup on or brush her hair." Tr. 63. Goyens testified that, because of her impairments,

she spends most of her days lying on the couch, using the Internet—specifically, Facebook. Tr. 64, 154. Goyens also alleges that her impairments took such a toll that she "can't read anymore" and that she cannot attend any of her son's football games or participate in activities she used to enjoy. Tr. 64-65.

The VE testified that Goyens worked in several occupations during the relevant period—as a cashier, repair order clerk, data entry clerk, administrative clerk, daycare teacher, and general office clerk. Tr. 67. The VE described this as unskilled work, usually at the light exertional level. Tr. 67. The ALJ asked the VE about the jobs a person of Goyens' age, experience and education, who was limited to only light work, could perform. Tr. 68. The VE stated that such a person that could not perform any of Goyens' past work. Tr. 68. However, the VE stated there are other jobs such a person would be able to perform, such as office helper, processing clerk, production assembler, and bench worker assembler. Tr. 69. On cross-examination by Goyens' attorney, the VE testified that, if such as person did not have frequent use of her hands, she would not be able to perform at any of the jobs he listed. Tr. 71.

On July 11, 2012, the ALJ issued a decision finding that Goyens' date last insured was September 30, 2011, and that she was not disabled as of her alleged onset date of December 31, 2007 through her date last insured. Tr. 33. The ALJ first found that Goyens had not engaged in substantial gainful activity since her alleged onset date. Tr. 23. Next, the ALJ concluded that Goyens' fibromyalgia, bipolar and anxiety disorders were "severe" impairments. Tr. 23-26. The ALJ specifically noted that Goyens did have other physical impairments, however, they were all "episodic, with none lasting 12

7

consecutive months or more . . . or they are essentially effects or symptoms of her
fibromyalgia." Tr. 24. Further, the ALJ found that Goyens' impairments, singularly or
in combination, did not meet or medically equal the severity of any impairment listed in
20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 26-27.[1] Next, the ALJ found that Goyens
had the residual functional capacity ("RFC") to perform less than the full range of light
work as defined in 20 C.F.R. § 404.1567(b). Tr. 27-31. Specifically, he found that
Goyens could stand and/or walk for six hours in an eight-hour day, and could lift, carry,
push, and pull 20 pounds occasionally and ten pounds frequently, with normal breaks.
Tr. 27. He listed several non-exertional limitations, including limiting Goyens' exposure
to hazards such as dangerous machinery or exposed heights. Tr. 27. Goyens was further
limited to simple, repetitive tasks involving only simple work-related decisions and
relatively few workplace changes. She was precluded from working in a fast-paced
production environment, and she was limited to only occasional contact with supervisors,
co-workers, and the general public. Tr. 27.

The ALJ found that Goyens was unable to perform her past relevant work through
September 30, 2011, her date last insured. Tr. 31. The ALJ noted, however, that Goyens
was 35 years old on her date last insured, that she had a high school education, and was
able to communicate in English. Accordingly, at step five, the ALJ relied on the VE's

---

[1] The ALJ's decision listed Goyens' alleged impairments as: bipolar disorder, anxiety, Lyme
disease, arthritis, body pain, chronic fatigue, irritable bowel syndrome, fibromyalgia, muscle
spasms, weakness and twitching, tingling and stabbing sensations, headaches, insomnia, vertigo,
ringing in her ears, blurred vision, nausea, vomiting, diarrhea, weight gain, a mitral valve
prolapse, shortness of breath, night sweats, depression, mood swings, irritability, confusion,
concentration problems, thinking problems, memory loss, a thyroid disorder, digestive problems,
possible neuropathy, panic attacks, and cognitive problems. Tr. 20.

testimony to find that Goyens was capable of making a successful adjustment to other work. Tr. 32-33. The ALJ therefore held that Goyens "was not under a disability, as defined in the Social Security Act, at any time from December 31, 2007, the alleged onset date, through September 30, 2011, her date last insured." Tr. 33.

Goyens requested review by the Appeals Council. The Appeals Council admitted additional evidence into the record but subsequently denied Goyens' request and upheld the ALJ's decision. Tr. 3-7. Goyens then filed this action.

Goyens now alleges the ALJ erred in several ways ways. First, she argues the ALJ erred when determining her RFC because he did not accord proper weight to the opinions of her treating physicians. Next, she argues the ALJ failed to properly consider her demeanor at the hearing, and that he did not take into account the obvious pain she displayed during her testimony. Further, she argues the ALJ did not properly evaluate her obesity or the side effects caused by her medications. She also contends she satisfied the Listing descriptions for affective disorders (12.04) and inflammatory arthritis (14.09). The remainder of her points relate to the ALJ's analysis of whether she could find work, given her RFC. Goyens contends the ALJ erred by finding there are jobs available in the national economy that she can perform, and that the ALJ also failed to determine whether she could maintain employment.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and

on which that party will bear the burden at trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d. 1069, 1075 (5th Cir. 1994). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. at 322-23; *Weaver v. CC.A Indus., Inc.* 529 F.3d 335, 339 (5th Cir. 2008). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F. 3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III.   STANDARD OF REVIEW

Judicial review of the ALJ's final decision under 42 U.S.C. § 405(g) is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the proper legal standard was used in evaluating the evidence. *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995); *Anthony v. Sullivan,* 954 F.2d 289, 292 (5th Cir. 1992). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Court must affirm the ALJ's final decision where substantial evidence supports the ALJ's decision and the Commissioner followed the relevant legal standards. *See Higginbotham v. Barnhart,* 405 F.3d 332, 335 (5th Cir.

2005).  Reversal is appropriate only where no credible evidentiary choices to support the Commissioner's decision.  *See Johnson v. Bowen,* 864 F.2d 340, 343–44 (5th Cir. 1988). In the determination of the claimant's ability to receive disability insurance and supplemental security income benefits, the Court must scrutinize the record as a whole to determine if the decision reached was reasonable and supported by substantial evidence. *Higginbotham,* 405 F.3d at 335.  "Substantial evidence" means enough evidence "that a reasonable mind might accept it as adequate to support a conclusion."  *Audler v. Astrue,* 501 F.3d 446, 447 (5th Cir. 2007).  This Court may not reweigh the evidence, try the issues de novo, or substitute judgment for the Commissioner's finding.  *Id.*

## IV.  ANALYSIS

### A.    Statutory Basis for Benefits

Social Security disability insurance benefits are authorized by Title II of the Social Security Act.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.  *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

SSI benefits are authorized by Title XVI of the Social Security Act and provide an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  20 C.F.R. § 416.110.  Eligibility for SSI is based on proof of disability and indigence.  *See* 42 U.S.C. § 1382(c)(a)(3) (definition of disability); 42 U.S.C. § 1382(a) (financial requirements).  Although these are separate and distinct programs, applicants to either program must prove "disability" under the Act.  *See* 42

U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. §1382(c)(3)(A) (SSI).   The law and regulations governing the determination of disability are the same for both programs. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

### B.   Determination of Disability

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."   *Id.* § 423(d)(2)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques. *Id.*; 42 U.S.C. § 1382c(a)(3)(B).

The five-step "sequential evaluation" process for determining disability is set out in the Commissioner's regulations.   The steps are: (1) Is the claimant currently performing substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent the claimant from doing past relevant work? (5) Does the impairment prevent the claimant from doing any other work? *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007) (summarizing C.F.R § 404.1520(a)(4)(i)-(v)).   If, at any step, the ALJ

determines the claimant to be disabled, the determination is conclusive and the inquiry ends. *Id.*

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform. *Id.* The Commissioner's analysis at steps four and five is based on the assessment of the claimant's RFC, or the work a claimant still can do despite his or her physical and mental limitations. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545 and 416.945. The Commissioner assesses the RFC before proceeding from step three to step four. *Id.* Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut the finding. *Id.*

### C.    Goyens' Residual Functional Capacity

Many of the issues raised in Goyens' motion for summary judgment relate to the ALJ's determination of her RFC. This term of art refers to an individual's ability to perform activities despite the limitations imposed by an impairment. *See* 20 C.F.R. § 404.1545; *see also Villa v. Sullivan,* 895 F.2d 1019, 1023 (5th Cir. 1990). "A person's 'residual functional capacity' is determined by combining a medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (citation omitted). The RFC assessment is based on all evidence, including medical evidence. SSR 96–8p.

13

### 1.  ALJ's Failure to Give Goyens' Treating Physicians Proper Weight

Goyens first contends the ALJ erred by failing to give more weight to the opinions of her treating physicians Dr. Noel, Dr. Salvato, and Dr. Forester.  Goyens contends her physicians' opinions were well-supported and should have been conclusive.  Further, Goyens complains that the ALJ relied upon a non-examining physician's opinion instead of the opinions of her examining physicians.  Finally, Goyens argues that the ALJ's RFC findings "directly contradict" her examining physicians' opinions, and thus are not supported by substantial evidence.

Under the Social Security regulations, a treating physician's opinion about the nature and severity of a claimant's impairment should receive controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see also Perez v. Barnhart*, 415 F.3d 457, 465–66 (5th Cir. 2005).  On the other hand, "good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).

When weighing medical opinions, the ALJ has considerable discretion and is free to reject the opinion of any physician if the evidence supports a contrary conclusion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d), (e); *Myers v. Apfe l*, 238 F.3d 617, 621 (5th Cir. 2001).  Simply identifying a "treating physician" as the source of a medical opinion will

14

not automatically entitle that opinion to such weight. Rather, the ALJ is free to assign little or no weight to the opinion of any physician whose statements are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. *Perez,* 415 F.3d at 466; *Newton,* 209 F.3d at 456. "Consequently, treating physician's opinions are not only not conclusive in these proceedings, but may be rejected when the evidence supports a contrary conclusion." *Holifield v. Astrue,* 402 Fed. App'x. 24, 25, 2010 WL 4560524, 1 (5th Cir. 2010) (citing *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir.1995)). Further, opinions that a patient is "disabled" or "unable to work" are not entitled to any special significance. 20 C.F.R. § 404.1527(e)(1). "These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'" *Id* .

Substantial record evidence supports the ALJ's findings in this case. The ALJ considered the attorney-generated forms completed by Dr. Noel, on August 27, 2010, Tr. 216-221; Dr. Salvato, on September 7, 2010, Tr. 211-215; and Dr. Forester, on September 23, 2010, Tr. 222-227. However, the ALJ opted to give these "fill-in-the-blank" answers little weight because they were unsupported by objective clinical findings and were inconsistent with the evidence as a whole. Tr. 26-31. The ALJ found the answers in the forms inconsistent with the record medical evidence and inconsistent with Goyens' own treatment records. Tr. 26-31.

The record supports the ALJ's decision to accord these opinions less weight. Dr. Noel's answers to the attorney-generated forms were inconsistent with his own treatment notes. Tr. 26-27, 29-30, 216-221. Goyens saw Dr. Noel from May 12, 2010 through

April 27, 2011, and Dr. Noel's mental examination findings were consistently normal. He never recommended any hospitalization, and he never noted episodes of decompensation. Tr. 27, 47, 516-529, 842-871. However, in the attorney-generated form, Dr. Noel stated that Goyens experienced three episodes of decompensation. Tr. 220.

Similarly, Dr. Salvato's opinions are also not supported by the medical evidence. Tr. 27-29, 211-215. Dr. Salvato opined that Goyens suffered from chronic fatigue syndrome, but she did not make this diagnosis while she was actually treating Goyens. Tr. 29, 211, 534-568. Dr. Salvato also opined that Goyens has several extreme physical limitations, yet, her treatment notes reveal Goyens' several laboratory tests and examinations were normal. Tr. 534-568, 576-577. The ALJ found that Dr. Salvato's answers in the generated form seemed to be based on Goyens' own self-reporting of symptoms rather than actual objective clinical findings. Tr. 29.

Finally, Dr. Forester's opinions were based on only a few months of treatment in 2008 and 2009, and more than a year had passed between the date of Dr. Forester's last examination of Goyens and the date on which he filled out a form in September 2010. Tr. 29, 222-227.

Accordingly, in light of the inconsistencies that undermine these physicians' opinions, the ALJ's decision to give little weight to these opinions is not erroneous, and the ALJ did not err by failing to factor these opinions into his RFC finding.

### 2.  ALJ's Failure to Consider Goyens' Demeanor at the Hearing

Next, Goyens contends that her "demeanor" during the ALJ hearing should have been taken into account.  Goyens argues that the ALJ's failure to note her obvious pain during the hearing is crucial because her demeanor at this hearing was consistent with her allegations of disabling symptoms and limitations.

An ALJ *may* consider a claimant's demeanor at the hearing in credibility determinations.  *Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir. 1990) (holding while exclusive reliance upon demeanor in credibility determinations is inappropriate, it is not reversible error for an ALJ to consider demeanor as *one* of several factors in evaluating a claimant's credibility).  The Fifth Circuit has noted however, "[e]ven if a person's demeanor can be taken to reflect his degree of pain when that pain is chronic, the issue is not how much pain [the claimant] suffers when he is at rest … the relevant question is how much pain he experiences when trying to work." *Lovelace*, 813 F.2d at 60  (noting a claimant's demeanor "sheds little, if any, light on the question of how much pain the claimant experiences when trying to work.").

Reviewing the transcript of the hearing, the Court notes that Goyens briefly referred to being in some amount of pain.  Tr. 62.  However, the ALJ was in the best position to evaluate and weigh that evidence, and in light of the medical evidence in the record, the Court finds that the ALJ did not err by finding that Goyens' complaints of pain and self-described limitations were not wholly credible.

### 3.  ALJ's Failure to Consider Goyens' Obesity

Next, Goyens argues the ALJ erred by failing to properly evaluate her obesity. The applicable regulations require an ALJ to analyze the impact of a claimants' obesity on their overall ability to work.  SSR 02-1p, 2002 WL 34686281 (September 12, 2002).

During the relevant period, Goyens weighed as much as 254 pounds.  Tr. 299, 432, 549, 658, 728-795, 938-990.  At the hearing, she stated that her current weight was 250 pounds and that she is 5′6″ tall.  Tr. 56.  Prior to the hearing, Goyens' representative submitted a brief alleging only two severe impairments: depression and fibromyalgia. Nonetheless, the ALJ considered other impairments, including Goyens' obesity, in his analysis. The ALJ's decision specifically noted, "[O]besity . . . operates as an aggravating factor with other impairments when deciding the claimant's [RFC]."  Tr. 26.

None of Goyens physicians identified any functional limitations that were caused by her obesity.  Tr. 133.  Similarly, Goyens did not testify that her obesity caused her any limitations, and nothing in the record suggests such a conclusion.  Tr. 133.  Accordingly, the ALJ did not err by failing to further limit Goyens' RFC due to her obesity.  In fact, the ALJ assessed a more restricted RFC—less than the full range of light work—than was suggested by the opinion of Dr. Samaratunga, who opined that Goyens could perform the full range of light work.

### 4.  Medication Side Effects

Next, Goyens argues that the ALJ's RFC failed to consider the side effects of her multiple prescribed medications.

SSR 96–7p requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms." SSR 96-7p, 1996 WL 374186 (July 2, 1996). Further, under SSR 96–8p, an RFC assessment "must be based on all of the relevant evidence in the case record," including the effects of treatment, such as side effects of medication. *Id.* The Fifth Circuit has held that consideration of the side effects of medicines is particularly important when medications are types that affect the brain, such as anti-depressant and anti-anxiety drugs. *See Loza v. Apfel,* 219 F.3d 378, 381, 394, 397 (5th Cir. 2000) However, a claimant's subjective complaints must also be corroborated, at least in part, by objective medical evidence. *Eovaldi v. Astrue,* 729 F.Supp.2d 848, 861–2 (S.D. Tex. 2010).

Goyens testified that her medications make her drowsy, nauseous, and dizzy, and that she stopped taking many of her prescribed medications because "they made me feel funny." Tr. 60. The ALJ's opinion expressly considered Goyens' medication and side effects, and devoted three paragraphs to considering their effects. Tr. 31. The ALJ noted that Goyens did not self-report any side effects from her fibromyalgia or Lyme Disease medications. Tr. 31. Significantly, from 2009 to 2010, when completing self-report forms, Goyens filled in every column except the columns for side effects. Tr. 542-543, 638-639, 644-645, 649-650, 654-655, 656. Further, the medical record does not show any substantial complaints by Goyens about side effects of her prescribed medications. To the contrary, Goyens reported that, despite her drowsiness and other side effects, she was able to watch television and use the Internet and Facebook as well as talk on the

phone and visit with friends.  Tr. 64, Tr. 154.   Goyens also reported being able to

perform chores, dress, bathe and drive independently.  Tr. 815.  Finally, Goyens herself

admits that she does not take all of her medications as prescribed.  In light of all of this

evidence, along with the ALJ's determination that Goyens' testimony about her

limitations was not wholly credible, the ALJ did not err by failing to consider the side

effects of Goyens' prescribed medications when formulating her RFC.

### D. Listings 12.04 and 14.09

Goyens also asserts that the ALJ's decision is erroneous because her impairments

meet or equal Listing 12.04, which pertains to affective disorders, and Listing 14.09,

which pertains to inflammatory arthritis.  At this step, the burden of proof remains on

Goyens to establish that she meets or equals a Listing.  *Muse v. Sullivan*, 925 F.2d 785,

789 (5th Cir. 1991).  If a claimant meets a Listing, she will be found disabled regardless

of her age, education, or work experience.  20 CFR § 404.1520(d); *see also Bowen v.*

*Yuckert*, 482 U.S. 137, 141, 107 S .Ct. 2287, 96 L.Ed.2d 119 (1987) ("If the impairment

meets or equals one of the listed impairments, the claimant is conclusively presumed to

be disabled.").  A diagnosis alone is insufficient to meet a Listing.  20 C.F.R. §§

404.1525(d) (2011).  Instead, "[t]o meet the requirements of a listing, you must have a

medically determinable impairment(s) that satisfies all of the criteria in the listing." *Id.*

In this case, the medical evidence does not show that Goyens met or equaled any

Listings.  The ALJ specifically considered whether Goyens met Listing 12.04, and he

found that her mental impairments were less than Listing-level severity.  Tr. 26-27.

Specifically, the ALJ found that Goyens' mental impairments did not "cause her listing

level effects on her life." Tr. 26. Although he noted that Goyens' mental impairments caused moderate restriction in her activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence and pace, the ALJ noted that she had no episodes of deterioration and that the criteria of the Listings were not satisfied because she did not have any documented sustained mental health treatment. Tr. 26. The ALJ also noted that Dr. Noel, whom Goyens saw 12 times between May 2010 and April 2011, never recommended any hospitalizations or documented treatment for any episodes of decompensation. Tr. 27.

As for Listing 14.09, there is no evidence or assertion that Goyens ever suffered from inflammatory arthritis. Tr. 26. She does not point to any documented medical evidence to support her allegation that the ALJ should have considered this Listing, nor does she point to any evidence that she was diagnosed with inflammatory arthritis or that she otherwise satisfied any of the criteria for the Listing.

Accordingly, the Court finds that the ALJ did not err in finding that Goyens' impairments, singularly or in combination, did not meet or medically equal the severity of a Listed impairment.

### E. ALJ's Finding of Alternative Employment

Goyens next argues that the ALJ erred in finding that a significant number of jobs existed in the national economy that she could perform. At this step, the Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy. *See Brown v. Yuckert,* 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the

Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested. *See Carey v. Apfel,* 230 F.3d 131, 135 (5th Cir. 2000). The vocational expert testified that Goyens could perform light work as an officer helper, processing clerk, and assembler. Tr. 32-33. An ALJ may properly rely upon the testimony and conclusions of a vocational expert. *Carey*, 230 at 145. Here, the ALJ relied on the vocational expert's testimony in response to the hypothetical question regarding the RFC limitations. Tr. 32-33. Goyens' contention that the ALJ erred in this reliance is based upon her contentions, discussed above, that the ALJ did not properly assess her RFC. Accordingly, the Court find that the ALJ did not err in finding that Goyens could perform alternative employment.

### F. ALJ's Failure to Determine Whether Goyens Could Maintain Employment

Goyens also argues that the ALJ failed to determine whether she was able to maintain such alternative employment.  Goyens cites to the Fifth Circuit's holding in *Frank v. Barnhart*, that if a claimant's impairment "waxes and wanes in its manifestations of disabling symptoms," the ALJ must not only find that the claimant's impairments do not prevent him from obtaining employment, but "also that the claimant will be able to maintain employment." *See Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005) (citing *Frank v. Barnhart*, 326 F.3d 618, 618 (5th Cir. 2003).  However, the Fifth Circuit has also held that "nothing in [these cases] suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Frank*, 326 F.3d at 619.  Instead, a finding that the claimant can maintain employment is required only when the claimant's impairment "waxes and wanes" in its manifestation of disabling symptoms. *Id.*  Further, "it is not enough for a claimant to assert, in general, that the impairment waxes and wanes; the claimant must demonstrate that [her] particular impairment waxes and wanes." *See Frank*, 326 F.3d at 465 (noting "[i]t is axiomatic that the pain from any type of ailment will vary in intensity, especially the farther one gets from treatment that alleviates pain").  Here, Goyens has failed to explain which of her impairments "wax and wane" in the manner described by *Frank*.  Goyens' testimony is not sufficient to meet the level of impairment required by the Fifth Circuit. *See Perez*, 415 F.3d at 465.  There is nothing in the medical evidence to support Goyens' testimony that she experiences good and bad days to the point that she is unable to sustain work.

*See id.* Accordingly, the Court finds that the ALJ did not err by failing to make a finding regarding Goyens' ability to maintain employment.

Further, Goyens contends that the ALJ failed to perform a "function-by-function assessment" of her abilities. The ALJ did provide a such a function-by function analysis in determining whether Goyens could maintain employment. Tr. 27-31.

## CONCLUSION

A review of the record reveals that the ALJ applied the appropriate legal standards in making his determination. Additionally, substantial evidence supports the ALJ's determination that Goyens is not disabled under the relevant provisions of the Social Security Act. A review of the pleadings and the record on file reflect that there is no genuine issue of material fact in this case, and entry of summary judgment against Goyens is therefore appropriate. *See* FED. R. CIV. P. 56. Accordingly, the Court **DENIES** Goyens' Motion for Summary Judgment and **GRANTS** the Commissioner's Motion for Summary Judgment.

Signed at Houston, Texas on September 22, 2014.

**George C. Hanks, Jr.**
**United States Magistrate Judge**

24